**SO ORDERED.**

**SIGNED this 12th day of May, 2025.**



_Dale L. Somers_
Dale L. Somers
United States Chief Bankruptcy Judge

Designated for online publication
**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS**

In re:

**Jacob Dean Lindesmith
Kelsey Dawn Lindesmith,**

                        **Debtors.**

**Case No. 24-40313
Chapter 7**

**Memorandum Opinion and Order
Denying Motion to Dismiss**

Debtors Jacob and Kelsey Lindesmith filed a voluntary Chapter 7 bankruptcy

petition to restructure their financial affairs after a period of unemployment left

them with significant debt. The U.S. Trustee moved to dismiss or convert Debtors'

case under 11 U.S.C. § 707(b)(3),[1] arguing Debtors have the ability to pay their

unsecured creditors and granting relief under Chapter 7 would be an abuse of the

---

[1] All statutory references are to Title 11, United States Code (the Bankruptcy Code)
unless otherwise indicated.

provisions of Chapter 7 under the totality of the circumstances. Debtors at the time of filing were below median income debtors.

A time-honored bankruptcy maxim is to provide a "fresh start" for the honest but unfortunate debtor. Debtors herein are such individuals and are deserving of that fresh start. Because the Court concludes the totality of the circumstances does not demonstrate abuse, the Court denies the U.S. Trustee's motion to dismiss or convert.[2]

## I.    Procedural History

Debtors filed their Chapter 7 bankruptcy petition on May 16, 2024. Debtors disclosed three vehicles on the Schedule A/B filed with their petition: (1) a 2019 Ram 3500 truck, valued at $45,000 and with $69,224.22 of debt, (2) a 2019 GMC Yukon, valued at $42,800 and with $65,396 of debt, and (3) a 2021 Keystone Avalanche travel trailer that had been repossessed prepetition. Debtors indicated an intention to surrender both the 2019 Ram 3500 and the 2019 GMC Yukon.

Debtors' Statement of Financial Affairs indicated a history of unemployment: Jacob had not earned wages prior to filing in 2024, while Kelsey had earned only $31,860. The Statement of Financial Affairs also indicated Debtors had liquidated their retirement accounts and Jacob had received $2356 in unemployment compensation in 2023. Debtors' Schedule I and J indicated Jacob had just become employed two weeks prior to the filing of the petition. At that point, Jacob's net

---

[2] Doc. 36. The U.S. Trustee appears by John Nemecek. Debtors appear by J. Shannon Garrett.

Case 24-40313    Doc# 71    Filed 05/12/25    Page 2 of 22

income was estimated at $5076.65 per month and Kelsey's net income was estimated to be $5627.96 per month, yielding a total net income of $10,704.61 per month. Debtors' expenses were listed as $6509 per month, but with little customization from the National Standards—e.g., Debtors listed their monthly rental expense at $993 and their monthly food and housekeeping supplies as $1200, the figures from the National Standards. Debtors' monthly net income after deduction of their expenses was $4195.61.[3]

The U.S. Trustee filed a motion to dismiss or convert Debtors' case, arguing abuse existed under § 707(b)(3) based on the totality of the circumstances and Debtors' ability to pay creditors based on their monthly net income. Debtors opposed the U.S. Trustee's motion and filed an amended Schedule I and J, showing increased expenses of $9909 primarily due to projected expenses for loans for automobiles of $3942.29 per month, this time resulting in monthly net income of only $253.32.[4] The Court scheduled a trial on the U.S. Trustee's motion, and just prior to trial Debtors filed newly amended Schedules I and J, this time yielding a monthly net income of $79.32.[5] This amended Schedule I and J will be discussed in more detail below.

## II.    Findings of Fact

At the time of trial, both Jacob and Kelsey were thirty-one years old. Debtors

---

[3] Doc. 1.

[4] Doc. 47.

[5] Doc. 64.

Case 24-40313    Doc# 71    Filed 05/12/25    Page 3 of 22

had been married eight years and have two small children: daughters who were five and two at the time of the trial.

Prior to filing bankruptcy, Jacob was unemployed for eight months,[6] and Debtors were living in their Avalanche travel trailer pulled by their Ram 3500 truck. Despite liquidating their retirement accounts,[7] Debtors incurred consumer debt during this time because they used credit cards to pay expenses. Debtors surrendered both the travel trailer and the truck as they could no longer afford the monthly payments on either and moved to Coffeyville, Kansas, where they have family support. Debtors began renting a home from Jacob's parents, and they needed to furnish the home completely after they moved in. Debtors pay rent of $1000 per month and are current on their rent. Jacob and Kelsey are both employed, and their daughters are in daycare full time. The girls' childcare costs are $1089.73 per month.[8]

Jacob is a high-school graduate with no further education. He works for a nitrogen fertilizer plant, and as noted above, he started the job just before the filing of Debtors' bankruptcy petition, on April 15, 2024. Jacob works a physically demanding and dangerous job in outside operations at the plant, as he is out in the

---

[6] As noted above, despite this lengthy unemployment, Jacob received only $2356 in unemployment in 2023 and zero unemployment in 2024.

[7] The liquidation of the retirement account resulted in a small tax bill which is reflected on Debtors' Schedules. Debtors do not typically owe money on their taxes.

[8] Debtors' amended Schedule J indicated childcare costs of $1279 per month, but at trial Debtors stated $1089.73 is the correct average monthly amount. *See* Exhibit T p. 1 (expenditure report, listing monthly average for childcare).

4

elements all day monitoring the status of certain chemical processes at the plant. Jacob makes an average of $3309.95 (gross) every two weeks at $33.02 an hour.[9] Debtors credibly testified their recently amended Schedule J contained an arithmetic error, and the Court concludes Jacob's accurate monthly net take home pay based on the average from his paystubs is $5000.12.[10]

Jacob works twelve-hour shifts. His position requires an unusual schedule: working a two-week rotation, with work for two or three days and then having two or three days off and requiring mandatory overtime of eight hours per two weeks.[11] The schedule rotates two weeks of days and then two weeks of nights, and then it repeats.[12] If Jacob is on dayshift, he sees his wife and children only briefly in the evening. If Jacob is on night shift, he sometimes sees them in the morning, if they are awake when he arrives home, but he generally does not see them much at all.

Jacob and Kelsey do not view this employment as sustainable long-term, as it is a physically difficult job and difficult on their home life, but Debtors felt it was the only choice in the short term due to limited employment opportunities in the

---

[9] Jacob contributes $184.07 to his employer's 401k account per pay period.

[10] The U.S. Trustee's contends Jacob's net take home pay is $5000.12, based on the sample paystub included by the U.S. Trustee in its Exhibit 2. The Court concludes the average net of $5000.12 is reasonable based on its review of the paystubs included in Debtors' Exhibit Q. The Court did not calculate the average of the January and February 2025 paystubs for Jacob as it did for Kelsey, *see infra* note 12, because Jacob's paystubs contained more marked fluctuations during that time.

[11] Of his biweekly average income of $3309.95, an average of $1395.67 is overtime, which is about 42% of his total wage.

[12] The two-week rotation requires working every other weekend. Jacob is also on call certain times during the two weeks.

5

area around Coffeyville, Kansas. Jacob hopes to start a home contractor/remodeling business someday or work in heavy equipment operation, as he has a background in both types of work. Debtors believe a home construction business is more realistic in their geographic area.

Kelsey is a nurse and has an associate's degree in nursing. Kelsey works as a hospice nurse, averaging (with overtime) about $1965.79 a week (gross), earning $36.90 an hour. The Court concludes the most accurate evidence of Kelsey's income is her paystubs, and the current average monthly net income from those paystubs is $5212.19.[13]

Kelsey works a more traditional daytime schedule.[14] Kelsey leaves home by 8:00 a.m. each day to take the children to daycare and returns home after picking up the children from daycare, at about 6:00 p.m., finishing the paperwork for her job after the children are in bed for the night. Kelsey travels amongst patient's homes, usually within about a sixty-mile radius, spanning three to four counties in Oklahoma. Kelsey is rarely in an office: she often works from her vehicle, documenting in electronic patient records and making phone calls. As a result, Kelsey is typically in her vehicle for five to six hours a day and drives an average of

---

[13] The Court calculates this net income from the average of the January and February 2025 net paystubs for Kelsey. *See* Debtors' Exhibit B pp. 67-71 (showing net pay of $1172.14 on 1/3/25, net pay of $1260.36 on 1/10/25, net pay of $1297.20 on 2/7/25, net pay of $1214.87 on 2/14/25, and net pay of $1069.50 on 2/21/25). The U.S. Trustee asserts Kelsey's average monthly net pay is $5461.56 based on her January 10, 2025, paystub, but the Court concludes the more persuasive evidence of Kelsey's net pay is found by computing the average as indicated.

[14] Kelsey does have one on-call weekend every twelve weeks, where she is on-call from Friday at 5pm to Monday at 8am.

6

1418 miles per month over a mixture of highway and gravel/rural roads. When she is driving through rural counties, she has limited cell phone service. In addition, many of the rural routes are not well maintained and have areas of very low or no maintenance—in the winter they can be snow packed, and alternately are washed out and suffer from flooding. As a result, Kelsey needs a vehicle with four-wheel drive and high clearance. Kelsey's employment is emotionally draining and physically taxing; she sees six to ten patients at the end of their life each day, and she needs reliable transportation to ensure she makes each visit.

Because of their work schedules, Debtors do not typically cook meals at home, relying on fast food or quick-service food. For example, Kelsey is generally solo with the family's two young girls due to Jacob's work schedule, and so she often picks up dinner for her and the girls on the way home from daycare, because by the time she is finished with work and able to get them home, there is no time to begin cooking a meal in addition to running the household and finishing her paperwork. Kelsey also purchases food on the go during her workday, as she spends so much of her workday on the road. Going forward, Debtors project food and household expenses of $2200 per month which the Court finds reasonable considering their work and family circumstances. Over the past six months, Debtors encountered even higher food and household expenses than this, but that was due at least in part to needing to furnish their home after living in the travel trailer.

Regarding vehicles, Kelsey still drives the 2019 Yukon, despite indicating the intention to surrender that vehicle at filing. Debtors believe the monthly payment

on the Yukon is too high at $1499 per month and they have been dealing with costly repairs for the vehicle as well.

As a result, Debtors are actively searching for a new vehicle for Kelsey, having contacted fifteen to twenty dealerships, seeking a late-model, full size SUV with four-wheel drive. Debtors' searches indicate the type of vehicle they are looking for will cost $36,000 to $50,000. Of the dealerships Debtors contacted, only five indicated a willingness to consider financing a vehicle for Debtors while they have an open bankruptcy case—the others denied Debtors' request outright due to their pending bankruptcy.

Ultimately, Debtors were unable to secure an offer for financing while in bankruptcy from any entity other than one (AutoNow), which offered multiple older (twelve to eighteen years old), high-mileage vehicles for sale with interest rates of twenty-two percent.[15] Debtors presented evidence the overall cost of the vehicles offered from AutoNow was a little more than twice the private party purchase price of the vehicle. To contrast, Debtors offered evidence showing the financing for vehicles they would be able to obtain for Kelsey if they complete a Chapter 7 case would be significantly more affordable.[16] Going forward, Debtors hope to obtain a

_____

[15] Similarly, although another lender ultimately refused to offer terms to Debtors because of the pending motion from the U.S. Trustee, the lender indicated it would typically offer interest rates of 16 to 21 percent to debtors in an ongoing bankruptcy.

[16] For example, a 2023 Ford Expedition, would carry a monthly payment of $836, with an interest rate of 9.9%, over 72 months. Another dealer would offer terms of 72 to 75 months, with interest rates of 13.9 to 14.9 percent, and monthly payments of $997 to $998, as long as Debtors' pending Chapter 7 bankruptcy was completed. Debtors credibly testified, and the documentary evidence showed, they would not be able to receive these terms while they are in an active bankruptcy case.

new vehicle with a monthly payment of $915 per month for Kelsey, which is the figure used in Debtors most recently amended Schedule J.

Jacob currently drives a truck he borrowed from his brother, for which he paid $1000 for that use. Jacob's brother has requested the return of the truck lent to the family and Debtors are hoping to purchase a used pickup truck for Jacob; they are looking for a pickup truck because of Jacob's desire to leave his current employment and start his own contracting business. Jacob will also need a four-wheel drive vehicle because of the condition of the roads in their area. Debtors hope to purchase a vehicle for Jacob with a monthly payment of $619, which they believe is achievable only if Debtors receive a discharge in their current case and exit bankruptcy. As noted above regarding Kelsey, Debtors put on uncontroverted evidence they could expect an interest rate of 10 to 13% outside of bankruptcy, but their interest rate in bankruptcy would be 16 to 21%. Debtors current credit scores are low: Jacob's credit score is 552 and Kelsey's credit score is 540. Per their credit reports, the projected twelve-month post-bankruptcy score for each is estimated at approximately 650.

Regarding transportation expenses, Debtors' fuel expenses are high due to the number of miles Kelsey drives for her employment. Kelsey does receive reimbursement for her mileage, but only 49 cents per mile,[17] not the 67 cents per mile per the federal recommendation for mileage reimbursement. Debtors also have increased transportation maintenance expenses due to the high use of Kelsey's

---

[17] Kelsey is taxed on this fuel reimbursement, as it is included in her gross income.

9

vehicle. Going forward, Debtors' projected transportation is $1418.74 per month for transportation, which includes fuel and maintenance. Again, the Court finds this number reasonable based on the specific facts of this case.

Debtors' amended Schedule J also includes a $150 monthly expense for their pet care: Debtors have three dogs, one of which is older and requires medication. Debtors also have cats and raise chickens. The U.S. Trustee pointed out that Debtors' Exhibit T showed Debtors are quantifying only $47.26 per month on pets, but as Kelsey credibly testified, that amount was only for the costs of pet expenses at designated animal stores, and did not include pet food from stores like Walmart or pet medication that could not be sorted out as easily. The Court concludes the monthly expense of $150 is accurate and reasonable.

Regarding healthcare expenses, Debtors' amended Schedule J indicates estimated monthly healthcare expenses of $265. Kelsey testified about this expense, indicating that while no one in the family needed regular medical care, they often experienced the need for copays or occasional medical treatment, as well as over the counter medications. Based on the age of their children and the rural area they live in, the Court concludes the estimated budgeted amount of $265 per month for the family of four is accurate and reasonable.

To sum, the Court concludes Debtors' monthly income is somewhat different than estimated on their most recent amended Schedule I based on Debtors' net income from their paystubs. The Court finds Jacob's monthly net income is $5000.12, and Kelsey's monthly net income is $5212.19, yielding a monthly

10

combined net income of $10,212.31. Although Debtors' Schedule J indicates monthly expenses totaling $10,083, the Court concludes Debtors' total expenses should be $9893.73, after making the change noted herein for actual monthly expenses for childcare. As a result, assuming Debtors are able to purchase vehicles with monthly payments of $915 and $619, Debtors would have a monthly net income of $318.58.

## III. Conclusions of Law

The Court has jurisdiction of this contested matter under 28 U.S.C. §§ 1334(a) and (b) and 28 U.S.C. §§ 157(a) and (b)(1). Because this matter concerns the administration of the estate, it is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

### A. Dismissal for Abuse under § 707(b)

Section 707(b) governs the dismissal or conversion of a debtor's bankruptcy petition to prevent abuse of the Chapter 7 provisions. Under § 707(b)(1), a debtor's case may be dismissed or converted to Chapter 13 if the bankruptcy court "finds that the granting of relief would be an abuse of the provisions of this chapter." Then under § 707(b)(3), if there has been no presumption of abuse (given the test set out in § 707(b)(2)), or if that presumption has been rebutted, the court should consider "whether the debtor filed the petition in bad faith" or whether "the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse."

The U.S. Trustee, as the moving party, bears the burden of proof to support its motion by a preponderance of the evidence.[18] The U.S. Trustee's only evidence

_____

[18] *In re Smith*, 585 B.R. 168, 175 (Bankr. W.D. Okla. 2018); *In re Doherty*, 374 B.R.

11

was examining Debtors and challenging Debtors' income utilizing Debtors' paystubs.

## B. Totality of the Circumstances under § 707(b)(3)

There is no "mechanical formula" for assessing abuse under § 707(b)(3): rather, "§ 707(b)(3) allows the court to make a broad, flexible review encompassing any factors that are relevant to the debtor's financial condition, including post-petition events that affect a debtor's finances."[19] Although a debtor's "ability to pay" debts in Chapter 13 is the "primary factor" for the court to consider under the totality-of-the-circumstances test,[20] a debtor's high income alone is not dispositive.[21]

Under this totality of the circumstances test, bankruptcy courts generally use a series of factors enumerated by the Tenth Circuit in *In re Stewart*[22] to analyze

---

288, 291 (Bankr. D. Kan. 2007).

[19] *In re Smith*, 585 B.R. at 175.

[20] *See Stewart v. U.S. Trustee (In re Stewart)*, 175 F.3d 796. 809 (10th Cir. 1999).

[21] 6 *Collier on Bankruptcy* ¶ 707.04 (Richard Levin & Henry J. Sommer eds., 16th ed.) ("The mere fact that a debtor has a relatively high income should not be sufficient to warrant a finding of abuse. To determine that a case was not filed in good faith solely on the basis of the debtor's ability to pay even though the means test concludes otherwise would be to invent a new means test, different than the uniform standard enacted by Congress after great deliberation and compromise to ensure that it appropriately balanced all of the interests involved.").

[22] 175 F.3d 796 (10th Cir. 1999). The *Stewart* case was decided prior to BAPCPA's change to the dismissal standards in § 707(b), but "courts generally agree that because Congress added the phrase "totality of the circumstances" to BAPCPA, the pre-BAPCPA cases employing the *Stewart* Factors are applicable to the analysis of "abuse" under § 707(b)(3)." *In re Smith*, 585 B.R. at 175. *See also In re Jaramillo*, 526 B.R. 404, 410-11 (Bankr. D.N.M. 2015) ("The Bankruptcy Code does not define when the 'totality of the circumstances' requires dismissal. Prior to the enactment of the BAPCPA, the Tenth Circuit used a totality of the circumstances test to interpret the term 'substantial abuse.' Today, courts generally agree that because Congress added the phrase 'totality of the circumstances' to the BAPCPA, the pre-BAPCPA

abuse under § 707(b)(3). Under *Stewart*, as noted, the "primary factor" is a "debtor's ability to repay his debts out of future earnings,"[23] but "other relevant or contributing factors" are whether the debtor "suffered any unique hardships, such as sudden illness, calamity, disability, or unemployment," whether the debtor's "cash advances and consumer purchases far exceeded his ability to pay," whether the debtor has a "stable source of future income," whether the debtor's "expenses can be significantly reduced without depriving him of adequate food, clothing, shelter, and other necessities," whether the debtor qualifies for Chapter 13 relief or if other state law remedies or private negotiation are available, the accuracy of the debtor's statements and Schedules, and "the debtor's good faith."[24] The totality-of-the-circumstances analysis is done on a case-by-case basis.

### C. Application of § 707(b)(3) to Debtors

The U.S. Trustee's primary focus is the allegation Debtors have an ability to pay creditors, based on the monthly net income assessed above and an analysis of Debtors' expenses.[25] The U.S. Trustee faults Debtors for the deflated income

---

cases using that test are still applicable to the analysis of 'abuse' under § 707(b)(3)." (internal citations omitted).

[23]  *In re Stewart*, 175 F.3d at 808.

[24]  *Id.* at 809-10.

[25] "A debtor's ability to pay is generally considered within the context of a hypothetical chapter 13 case." *In re Serna*, __ B.R. __, 2025 WL 1326671, at *4 (Bankr. D. Kan. Apr. 2, 2025) (internal quotations omitted). The parties agree Debtors are below-median income debtors due to Jacob being unemployed the entire six months prior to filing Debtors' petition. "In a Chapter 13, a debtor's disposable income is calculated by determining their 'current monthly income' as defined in § 101(10A) less 'amounts reasonably necessary to be expended' for the maintenance and support of the debtor and their dependents. For below-median income debtors,

expressed on the amended Schedule I[26] and contends Debtors' expenses show their ability to pay a significant dividend to creditors in a Chapter 13 case. Specifically, as to expenses, the U.S. Trustee contends Debtors' medical and pet care expenses are overstated, faults Debtors for their high monthly food and housekeeping supplies expense of $2200 per month, and contends Debtors' transportation expenses for replacement vehicles are unreasonably high compared to the IRS standards.

First, as indicated above, Debtors credibly testified their monthly expenses of $150 for pet care and $265 for medical care are accurate. The Court concludes the evidence supports the figures for both. Kelsey credibly testified about the needs of their household pets and chickens, and how they pay for the supplies for both. Regarding medical care, although it is true no family member has recurring, consistent medical needs, Kelsey credibly testified about the inconsistent and unknown expenses that come up as to their healthcare. As any parent of young children knows, medical expenses for young children can be seasonally dependent, but the budgeted amount correctly reflects an average.

Debtors' budgeted expense for replacement vehicles is also well supported by the evidence.[27] Debtors' prepetition vehicles were significantly under secured.

---

the bankruptcy court must determine whether the debtor's listed expenses are 'reasonably necessary' for the debtor's maintenance." *Id.* (internal citations omitted).

[26] Debtors' Schedule I shows a net income of $10,162.32. Based on the net income computed by the Court of $10,212.31, there is only a difference of $49.99 per month.

[27] *See In re Scarafiotti*, 375 B.R. 618, 636 (Bankr. D. Colo. 2007) (concluding that an increase of $803 in disposable monthly income due to not have a vehicle payment

Debtors made the financially sound decision to surrender those vehicles in their bankruptcy, receive a discharge of the debts, and then purchase new vehicles based on their new circumstances. The U.S. Trustee contends the expense for replacement vehicles is speculative because it is "unclear if or when they will have such expenses in the future."[28] But the evidence was clear Debtors must each purchase a replacement vehicle, and soon. Jacob's brother has already asked for the return of the vehicle lent to Jacob. Kelsey's vehicle needs repairs and Debtors have already indicated their intent to surrender that vehicle. Debtors must purchase two vehicles, as both require transportation to employment, and for Kelsey, she needs her vehicle during her employment.

   As Debtors note, however, their plan only works if Debtors can obtain a discharge and therefore establish more reasonable financing. Debtors provided the Court with evidence about the expected increase to their credit scores after completion of the Chapter 7 case, the difference in the interest rates they would expect to obtain if financing while in a Chapter 13 case, and the expected cost and monthly payment for replacement vehicles. Debtors need larger, four-wheel-drive vehicles because of where they live and the roads they travel. Debtors' evidence on this matter was thorough and well presented, even presenting the Court with

---

was not sufficient to warrant dismissal under § 707(b)(3) because the debtors may need to replace their vehicles due to their current high mileage cars); *In re Lindstrom*, 381 B.R. 303, 309 (Bankr. D. Colo. 2007) (concluding that the surrender of a vehicle, and resulting increase of $700 in monthly income, was insufficient alone to warrant dismissal under § 707(b)(3)).

[28] Doc. 69 p. 11.

pictures of the washed out, snow-packed roads they must travel which require four-wheel drive. Debtors not only established the need and plan to purchase two vehicles, but they also established the reasonableness of the amount for those vehicles and the monthly payment they should expect. The IRS standard is simply insufficient under the facts of this case.

Second, the Court concludes the food and household expense category of $2200 per month, while high, is not unreasonable based on the facts of this case.[29] Debtors both work demanding jobs with significant overtime. They are literally run ragged. They are on the go each day and neither works a "desk job" where they can sit and eat a packed lunch while they have a break from work. Debtors have two small children in day care full time, and by the time they get to see their children at the end of each workday, it is reasonable all they are able to do is pick up a quick service meal rather than cooking food from scratch from the grocery store. Let's also not forget the privilege of time: to meal plan, shop for groceries, cook the food, and clean the kitchen. Debtors' budgeted $2200 per month on food and household expenses is reasonable under Debtors' circumstances.

Yes, based on these reasonable and necessary expenses Debtors have a small

---

[29] As the U.S Trustee notes, the applicable IRS standards for food and housekeeping supplies are $1225 per month, and while these figures are a helpful guide, they are not sacrosanct. *See In re Gonzalez*, 378 B.R. 168, 175 (Bankr. N.D. Ohio 2007) ("[A]s a pole for guidance, the expense figures provided in the 'means test' can be helpful when determining the reasonableness of a debtor's expenses under § 707(b)(3). The underlying goal of both the 'means test' of § 707(b)(2) and the 'totality of the circumstances' test of § 707(b)(3) is the same: to ensure that only those debtors deserving of Chapter 7 relief are afforded its benefits.").

16

amount of monthly disposable income based on their current employment: $318.58. But Debtors put on credible and extensive evidence that this monthly income is simply unsustainable. Kelsey's employment appears stable, and her income can be expected to continue. But Jacob's income is not expected to continue. The Court heard detailed and extensive evidence of the toll of Jacob's employment on him and his family.[30] Jacob intends to leave his employment as soon as the Debtors receive their discharge and fresh start, so he can start a contracting business of his own. This is a realistic plan: Jacob has a prior history in this work and has family help in the area. But obviously, he cannot be expected to earn the high income he began just prior to filing his petition.[31] Debtors cannot generate a return to creditors if they cannot sustain the employment that would allow them to do so.[32]

---

[30] The obvious mental health strain from Debtors' current situation should not be discounted. *See, e.g.*, *In re Hadl*, __ B.R. __, 2025 WL 1326982, at *10 (Bankr. D. Kan. Apr. 2., 2025) (noting that while there was no "sudden calamity" in the debtors' case, when considering the § 707(b)(3) totality of the circumstances, the "obvious mental health strain" the debtors were under weighed in favor of finding no abuse).

[31] The median *gross* income for a household size of one in Kansas generally, i.e., not specifically in rural southeast Kansas, is $5125 per month. In other words, a significant downward departure from Jacob's current gross income of approximately $6646.88 per month. *See* U.S. Trustee Exh. 2. If Jacob is able to obtain new employment with that lower gross income, it would not be enough to pay monthly expenses and a dividend to Debtors' general unsecured creditors.

[32] For this same reason, the Court is unconcerned about Jacob's postpetition contribution to his employer's 401k program. Debtors will no longer be able to make that contribution when Jacob leaves his current employment as planned. In addition, Debtors emptied their retirement savings prepetition to pay necessary living expenses, and therefore they are completely starting over to save for retirement. Kelsey's paystubs indicate no retirement contribution, and the small amount taken from Jacob's gross pay each pay period is small and appears reasonably necessary for Debtors' future support. *See, e.g.*, *In re Smith*, 585 B.R. 168, 180 (Bankr. W.D. Okla. 2018) (considering retirement contributions "as a

The Court has previously noted it would consider "both current and foreseeable circumstances of a debtor's financial condition" to determine questions of abuse under § 707(b)(3). Section 707(b)(3) "is not dependent on the petition date and what happens prior to filing; rather, whether to dismiss a case for abuse may depend on developments occurring after filing but before discharge is granted."[33] In addition, courts should take "a broad, flexible review encompassing any factors that are relevant to the debtor's financial condition including post-petition events that affect a debtor's finances."[34] These postpetition events—the need to establish more reasonable employment for Jacob—influence the Court's conclusion the Debtors' no not have a realistic ability to pay a dividend to creditors.

---

factor for possible abuse under § 707(b)(3) by evaluating whether such contributions appear to be reasonably necessary for the support of the debtor or the debtors' dependents" and considering the following factors in that analysis: "(1) the debtor's age and time left until retirement; (2) the amount of the debtor's existing retirement savings (3) the level of yearly income; (4) overall budget; (5) amount of monthly contributions; (6) the number and nature of the debtor's dependents; (7) evidence that the debtor would suffer adverse employment conditions if the contributions are ceased; (8) who is challenging the pension payments and (9) any other constraints on the debtor that make it likely that pension contributions are reasonably necessary expenses for this particular debtor"); *In re King*, 303 B.R. 522, 531-32 (Bankr. D. Kan. 2004) (applying case-by-case approach to determine whether voluntary retirement contributions qualify as a reasonably necessary expense and concluding a $389.22 monthly 401k contribution was reasonable where the debtor was forty-seven years old with a $75,000 balance in his plan).

[33] *In re Vogeler*, 393 B.R. 240, 242-43 (Bankr. D. Kan. 2008).

[34] *In re McKay*, 557 B.R. 810, 817 (Bankr. W.D. Okla. 2016); *In re Mondragon*, No. 7-05-10665-MR, 2007 WL 2461616, at *4 (Bankr. D.N.M. Aug. 24, 2007) ("[T]he debtor's financial situation as of the date of the filing of the petition, as well as post-petition changes to a debtor's income and expenses are relevant to the determination of whether a debtor's Chapter 7 petition should be dismissed under § 707(b)(3).").

18

Additional factors from *Stewart* also cut in Debtors' favor. Regarding whether Debtors suffered any unique hardships, Jacob's prepetition unemployment was not necessarily unique—many debtors suffer job loss. But the extended nature of his unemployment was unusual and damaging, and Debtors received very little unemployment compensation to keep them on their feet during his eight-month unemployment. In addition, Debtors' hardship was compounded by the geographic area in which they live. The Court heard testimony from Debtors that there are few jobs available in the area: a small, rural southeast Kansas community on the Kansas/Oklahoma border.

An additional *Stewart* factor, whether a debtor has a "stable source of future income," is not only an additional factor supporting the totality of the circumstances view that Debtors' financial situation does not demonstrate abuse, but also is an additional factor supporting the conclusion Debtors do not have an ability to pay simply because of the high income Jacob began as Debtors' petition was filed. As the Court has noted herein, Jacob cannot sustain this employment. It is difficult physically on Jacob and difficult on his family, and not a "stable" source of future income. The testimony was clear Jacob cannot stay in his current position for much longer, and as a result, he will need to find either a lower paying job in the area, or start his own business, which will not provide stable, high income for at least some time.

An additional relevant factor is that Debtors' prepetition behavior

demonstrates good faith.[35] There was no evidence of cash advances, or purchases made when Debtors knew they did not have the ability to pay.[36] Rather, all evidence was that Debtors did only the minimum to survive while Jacob was unemployed.[37] Debtors moved to Coffeyville, Kansas to be closer to family. Debtors relied on that family help for transportation and housing. Debtors have surrendered their high expense, under secured vehicles. Debtors cashed in their retirement savings. Kelsey took a job and began making a good salary. They did incur credit card debt, but it was for necessities like food, household supplies, and medical care.[38] The Court readily finds Debtors filed their Chapter 7 petition in good faith in an attempt to right the ship and achieve a fresh start. Debtors also testified to the length they went to compute accurate averages for their Schedules, and there is no evidence

---

[35] "The question under § 707(b)(3) is not whether the [debtors] have acted in good/bad faith throughout the case—it is whether they filed their petition in good/bad faith." *In re Hadl*, __ B.R. __, 2025 WL 1326982, at *11 (Bankr. D. Kan. Apr. 2, 2025) (discussing cases).

[36] Debtors are not attempting to retain luxury goods or other secured debts not reasonably necessary for the maintenance and support of their family. *See In Re Gourley*, 549 B.R. 210, 220 (Bankr. N.D. Iowa 2016) (concluding an expense to keep a camper is not reasonable or necessary when assessing § 707(b)(3)).

[37] To contrast, this is not a situation where the debtor was engaged in significant prepetition gambling, *see In re Smith*, 585 B.R. at 177 ("In this Courts opinion, continuing to gamble during the slide into bankruptcy while leaning upon family largesse and state unemployment benefits is the sort of debtor action that crosses over a line of appropriateness. It is not the good faith required of debtors."), or bad faith in receiving a windfall, *see In re Vogeler*, 393 B.R. 240, 242-43 (Bankr. D. Kan. 2008) (finding abuse where the debtor entered bankruptcy with $47,000 in debt and received more than $90,000 in lottery winnings).

[38] Doc. 1 p. 32 (Schedule E/F showing unsecured debt, other than deficiency claims from surrendered vehicles, of $39,164.28). Based on the claims filed in Debtors' case, the general unsecured claims currently total $76,761.99, although no deficiency claim has yet been filed regarding the GMC Yukon or the Ram.

Debtors have not been entirely forthcoming and candid with their petition or supporting documents, or with the Court.[39]

Finally, regarding whether Debtors' expenses can be significantly reduced without depriving the family of adequate food, clothing, shelter, and other necessities, the Court concludes there is no significant reduction to be found. The Court heard from both Jacob and Kelsey about their monthly expenditures and finds no extravagance or areas for significant reduction. If Jacob is able to find different employment or start a business, the family may have more time to shop for food and create meals at home, but any reduction in expenses would be far offset by his reduced income.

Overall, the Court concludes the preponderance of the evidence does not show "the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse."[40]

## IV.  Conclusion

After careful consideration of the evidence and the arguments, the Court denies the U.S. Trustee's motion to dismiss or convert.[41] Debtors are hardworking,

---

[39] Minor inaccuracies should not deprive a debtor of relief under the Code absent some "additional indica of bad faith." *In re King*, 308 B.R. 522, 536 (Bankr. D. Kan. 2004). Debtors did file amendments to their Schedules I and J. Understandably, at the time of filing, Debtors were in flux: they had just come out of a long period of unemployment and had just moved into a new home. It was reasonable to use the standardized figures as they would have had no reliable historical averages. The Schedule I and J filed just prior to trial was the result of a comprehensive survey of their finances, and very thoroughly categorized and itemized Debtors' spending.

[40] § 707(b)(3).

[41] Doc. 36.

21

conscientious individuals doing their best in difficult circumstances. The Court concludes there is no meaningful basis to determine they have an ability to pay creditors, and after considering the totality of the circumstances, there are additional factors that support the conclusion there is no abuse under § 707(b)(3).

**It is so Ordered.**

###